IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ZALLASSIO SAIN,

                      Plaintiffs,

        v.

ADAM MATTSON and DANE COUNTY,

                     Defendants.

OPINION AND ORDER

21-cv-145-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil action brought under 42 U.S.C. § 1983, plaintiff Zallassio Sain contends that Dane County Deputy Adam Mattson applied unconstitutional force against him by deliberately slamming his head into a wall and injuring him while Mattson was escorting him down a hallway at the Dane County jail on September 16, 2018. The event was captured on jail surveillance video. Defendants Mattson and Dane County have moved for summary judgment. (Because plaintiff does not assert any claims against Dane County but has named it as a defendant solely for indemnification purposes, I shall refer solely to defendant Mattson in this opinion.) Defendant does not deny that he took actions toward plaintiff that caused plaintiff's head to strike a wall, but he insists that it was the misfortunate and unintended outcome of an otherwise-justified attempt to gain control of plaintiff, who had escaped defendant's escort hold.

After considering the parties' summary judgment materials, including the surveillance video of the incident, I conclude that there are disputed issues of material fact that must be resolved by a jury. In addition, I conclude that defendant is not entitled to qualified immunity.

Preliminarily, I note that both parties filed proposed findings of fact.  Defendant objects to plaintiff's proposed facts, arguing that they exceed what is permitted by this court's summary judgment procedures.  This objection will be overruled.  This court's rules governing summary judgment specifically permit a responding party to propose its own facts "if it needs them to defeat the motion for summary judgment" and to supplement the moving party's proposed findings of fact.  Procedure to be Followed on Motions for Summary Judgment, II B.  What the rules prohibit is a responding party who disputes the movant's proposed facts *solely* by submitting its own proposed facts without also filing a separate response to the moving party's proposed findings of fact.  Id., II. B.2. (explaining that additional proposed findings of fact "do not take the place of responses.").  Plaintiff did not do that here:  he filed responses to defendant's proposed findings of fact as well as his own proposed facts.  This was proper.

Defendant further objects to several of plaintiff's proposed facts on the ground that they describe events preceding the escort and are therefore immaterial.  This is a curious objection given that defendant proposed many of the same facts.  In any case, the facts provide helpful context and background, so I have included them.

From the parties' proposed findings, as well as the video of the incident, I find the following facts to be undisputed, except where otherwise noted.

2

FACTS

The incident giving rise to the complaint occurred at the Dane County jail on September 16, 2018.  Plaintiff Zallasio Sain was an inmate at the jail, awaiting transfer to prison after having had his extended supervision revoked three days earlier.  Defendant Adam Mattson was a deputy working as a correctional officer at the jail.

Part of the Dane County jail is housed on the 6th and 7th floors of the City-County Building.  That portion of the jail consists of four wings:  6 East, 7 East, 6 West, and 7 West. On the date of the incident, plaintiff was housed in cell block 626 in wing 6 East of the jail. Shortly after 10 a.m., Deputy Kyle Stumpf escorted plaintiff to the visitation room on the same floor for a visit.  Plaintiff was upset because Stumpf had arrived late for the escort. When they arrived at visitation, Stumpf asked visitation staff to give plaintiff extra time to make up for the time he lost, and staff agreed to do so.  However, when the normal visitation time ended, staff told plaintiff his visit was over and did not give him the extra time.

Meanwhile, defendant arrived at the door to the visitation room to escort plaintiff and any other inmates from 6 East back to their cell block.  Plaintiff stepped out into the hallway with defendant.  Plaintiff was unhappy because he had not been allowed the extra visitation time.  Visitation staff radioed defendant and asked whether any other inmates from 6 East were left in the visitation room.  Defendant, who had not previously interacted with plaintiff, turned to plaintiff and asked him whether any inmates remained in the room. Plaintiff replied:  "That's not my job."  Defendant asked plaintiff a second time whether any inmates from 6 East were left in the visitation room, to which plaintiff answered, "That's not

my fucking job, I don't know." Defendant told plaintiff not to yell at him and began to escort him back to his cell block. As they passed a cell block near visitation, one of the inmates in the block yelled something to plaintiff, and plaintiff responded. Defendant yelled, "No yelling through the blocks!" and threatened to put plaintiff on a 24-hour lockdown, which meant he would be confined in his individual cell within the cellblock for 24 hours. Plaintiff responded to defendant that he did not "give a fuck" about locking down.

Plaintiff and defendant continued bickering as they rounded the corner into the hallway that led directly to the 6 East cell blocks. The parties dispute what was said during this time: defendant says he gave plaintiff the choice of calming down or being charged with a disciplinary violation, in which case he would go to the lockdown block (*i.e.* segregation) up on the 7th floor, and that plaintiff chose to go to the lockdown block. Plaintiff denies that he was given this choice. During this escort, plaintiff was not in handcuffs and defendant did not make any physical contact with him.

Defendant told plaintiff to turn left towards the deputy station on 6 East, rather than right towards plaintiff's cell block, and plaintiff complied with defendant's direction. During the escort, plaintiff continued to talk over defendant and repeatedly yelled "I don't give no fuck." At the deputy station, they encountered Deputy Stumpf, and he and plaintiff talked about the visitation mix-up. Defendant told Stumpf that plaintiff was going to be locked down for 24 hours. Plaintiff again said that he did not care if he was locked down for 24 hours, and told defendant just to take him back to his cell block. Defendant told plaintiff, "No, you're going upstairs," meaning that he was going to the lockdown block on 7 West.

At that point, plaintiff had broken at least one if not more jail rules by acting in a disorderly manner. (Defendant says that plaintiff continued yelling during this time, but plaintiff denies this.)

Defendant told plaintiff that he was going to handcuff him, which is defendant's normal practice when taking an inmate to segregation. Plaintiff turned around voluntarily and put his hands behind his back to be handcuffed. Plaintiff was not resisting and was not a "high risk" inmate, and he quieted down after being handcuffed. Plaintiff says defendant nevertheless put the cuffs on so tightly that they were painful, and then deliberately jerked plaintiff's arm and wrists up after putting him in the cuffs, causing more pain. Defendant denies this.

Defendant told plaintiff to go through the doorway into the hallway, and plaintiff complied. Defendant planned to get to the lockdown block by taking the 6 West elevator. (Plaintiff proposes various facts suggesting that a different elevator was typically used to transport inmates, but the relevance of these facts is unclear. It is undisputed that defendant was not planning to take the stairs.) However, defendant did not tell plaintiff this, nor did he give him any further directions about where to go.

Defendant escorted plaintiff with his right hand holding on to the inside of plaintiff's left bicep. At some point, Deputy Stumpf entered the hallway and began following closely behind defendant and plaintiff. Plaintiff says that during this escort, defendant twisted plaintiff's arm so that the cuffs would hurt and plaintiff told him multiple times that it hurt. Again, defendant denies this.

Surveillance video from the jail hallway captures a portion of the escort and the event leading to this suit.  The quality of the video is fairly good, but there is no sound.  At 3:02 on the surveillance tape, the three men come into view, backs facing the camera.  Plaintiff walked in front, hands cuffed behind his back.  Defendant was directly behind him and to plaintiff's left, his right hand holding on to plaintiff's left bicep.  Deputy Stump followed closely behind, his body partially blocking the view of defendant and plaintiff.  At no time on the surveillance video did defendant yank plaintiff's arms or wrists up or take any action in relation to the handcuffs.  However, the video does not capture the first part of the escort, which occurred off-camera.

At 3:10 on the video, plaintiff turned his head to the left, in defendant's direction, and said something over his shoulder to defendant.  (Plaintiff says he was telling defendant the handcuffs were too tight and would have to come off when they got to the lockdown block, but defendant disputes that the handcuffs were too tight or that plaintiff said this.)  A second later, plaintiff turned his head back to face forward, then turned to the right, and stepped forward with his right foot.  Although not visible on the surveillance tape, the parties agree that plaintiff turned into a stairwell that leads up to the 7th floor.  Although the view of plaintiff is partially blocked by Stumpf, plaintiff did not run, move quickly, jerk away from defendant, or take any evasive actions.  Rather, plaintiff turned at a normal walking pace and began to ascend the stairs.  Plaintiff does not remember anything else about the incident after he turned right and stepped toward the stairwell.

Defendant reacted quickly to plaintiff's right turn.  As plaintiff moved to put one foot

6

on the first step, defendant spread his legs apart to brace himself, and grabbed plaintiff's left arm with both hands.  Plaintiff, who was standing vertically, paused and looked back at defendant.  Video, at 3:11.  Defendant yanked plaintiff away from the staircase and off the step with substantial force, swinging his body in front of the deputy's body.  Plaintiff's body moved at a downward angle, and his head struck the wall forcefully opposite the staircase, with his knees ending up on the floor below him.  Video at 3:11-3:14.

Plaintiff was knocked unconscious from the impact.  His head was lacerated on impact and bled profusely.  Defendant put plaintiff into a recovery position on the floor and radioed for assistance.  Jail staff helped plaintiff to his feet, put him into a restraint chair, and took him to health services for medical attention.  The next day, he was taken to the hospital and given a diagnosis of a concussion.  His wound did not fully heal for two months.

Defendant prepared a report shortly after the incident.  In the report, defendant said that when they approached the stairwell, plaintiff "pulled away" from him and "was able to break free" from the deputy's grip.  Dkt. # 28-4, at 4.  Defendant says that he then grabbed onto plaintiff's left arm with both hands and turned to his left, pulling plaintiff towards him with "the intent of pushing him up against the wall to gain control of him," which turned into a "dynamic application of a trained technique." Id.  (Defendant does not specify in his submissions what "trained technique" he was applying.  At his deposition, he said that all he was trying to do was to pull plaintiff into him to gain control and was not attempting to stabilize him against the wall.  In his declaration submitted in support of summary judgment, however, he says his plan was to stabilize plaintiff against the wall once he got

7

control of him.)  Defendant said that as he pulled plaintiff towards him, plaintiff started to fall towards the ground, ultimately striking his head on the wall.  Defendant denied intending that plaintiff would strike his head in any way, a position he maintains on summary judgment.

At no time on the surveillance video does plaintiff appear to break completely free of defendant's grip; rather, defendant appears to maintain a hold on plaintiff at all times. However, one cannot tell from the video whether defendant may have lost some control of his grip as a result of plaintiff's right turn.

OPINION

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." Brummett v. Sinclair Broadcast Group, Inc., 414 F.3d 686, 692 (7th Cir. 2005).  If the nonmoving party fails to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper.  Celotex, 477 U.S. at 322.

A.  Excessive Force

The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits the

8

"unnecessary and wanton infliction of pain" on a prisoner.  Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009).  To prevail on an Eighth Amendment excessive force claim, a prisoner must prove that the offending officer applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline."  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)).  In determining whether an officer's use of force was excessive, relevant factors include why force was needed, how much force was used, the seriousness of the injury inflicted, whether the defendant perceived a threat to the safety of staff and prisoners, and whether efforts were made to temper the severity of the force.  Whitley, 475 U.S. at 321.  Prison and jail officials' decisions are entitled to some deference, because officials must balance the need to maintain and restore discipline with the risk of injuring an inmate, and they must often act quickly and decisively.  Hudson, 503 U.S. at 6.  But correction staff may not inflict unnecessary and wanton pain on prisoners.  Id.  "Summary judgment is often inappropriate in excessive force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations."  Cyrus v. Town of Mukwonago, 624 F.3d 856, 862 (7th Cir. 2010) (citing Catlin v. City of Wheaton, 574 F.3d 361, 367 (7th Cir. 2009)).

In his summary judgment brief, defendant argues that this court need not even consider the Whitley factors because he did not use any force at all.  According to defendant, plaintiff surprised him when he turned into the stairwell and "tried to break away" from the escort hold.  As defendant describes it, all he did was instinctively reach for plaintiff and pull

him back towards him in an effort to regain his escort hold, and it was the combination of that pull-back and plaintiff's imbalance on the step that caused him to fall. Plaintiff's injury, says defendant, "was not the result of force, but a result of physics." Br. in Supp., dkt. #17, at 11.

It may be true that defendant did not intend to "throw" plaintiff headfirst into the wall, as plaintiff characterizes it, even though it appears that way in the video. Even so, defendant's assertion that he did not use any force at all is patently unreasonable. Putting aside the disputed question whether plaintiff actually broke free of defendant's grasp, defendant's suggestion that he simply "pulled" plaintiff back towards him is a drastic understatement; "yanked" or "jerked" more aptly describes defendant's action. Indeed, the idea that defendant pulled plaintiff forcefully is supported by the fact that defendant spread his legs into a wider stance to brace himself as he did so. Additionally, the speed with which plaintiff's body traveled in front of the deputy and into the adjacent wall – along with the fact that he was knocked unconscious – leaves little doubt that defendant applied no small amount of force, even if plaintiff's imbalance arguably contributed to his momentum. Finally, defendant admits that his ultimate goal was to move plaintiff to the adjacent wall in order to stabilize him, which could not have occurred without some application of force. The fact that things may not have gone as planned may bear on whether defendant intended to harm plaintiff, but it does not dispense with the analysis altogether.

Applying that analysis, I cannot find as a matter of law that defendant acted in good faith and not maliciously or wantonly. Defendant argues that the force he applied was only

that necessary to reestablish physical control over plaintiff, who posed a threat to institutional security when he attempted to "evade an escort."  However, there are various facts from which reasonable jurors could question whether defendant genuinely believed that plaintiff was attempting to evade an escort, including plaintiff's rather nonchalant demeanor as he turned into the stairwell, his lack of sudden movement, defendant's failure to tell him the planned route to the 7th floor, and plaintiff's undisputed compliance with all of defendant's directives up to that point.  Also disputed is the degree to which defendant maintained control of plaintiff when he turned.  Defendant insists that he lost control of his grip, which certainly seems plausible, given that plaintiff and defendant were moving at a right angle from each other when plaintiff turned.  However, the video shows that defendant's right hand maintained some kind of contact with plaintiff's left arm at all times, calling into question whether he actually believed plaintiff was trying to get away from the escort before he yanked him.

Moreover, even if a jury were to accept that defendant lost some degree of physical control over plaintiff when he turned, it could also conclude that defendant had no need to respond with any force at all, much less yank him with such force that he careened head-first into the wall.  As defendant himself points out, plaintiff was not a recalcitrant inmate, was already in handcuffs, and had been complying with defendant's directives.  In addition, Deputy Stumpf was following closely behind.  Given that plaintiff had been complying with all of defendant's orders at that point and did not pose a danger to anyone other than himself (if he tripped on the stairs while in handcuffs), a jury could find that defendant could

11

have tempered his actions by using less force or by simply redirecting plaintiff when he started going the wrong way.

Defendant insists that there was no time for such instructions because he had only a "split-second" to react, but this assertion depends on the reasonableness, and plausibility, of his belief that plaintiff's actions posed an urgent safety or security threat.  Notably, although defendant suggests that a deputy must maintain a firm grip on a handcuffed inmate at all costs, he has not presented any evidence to support that assertion.  See Reply Br., dkt. #34, at 10-11.  Moreover, I cannot find support for this assertion in Lunsford v. Bennett, 17 F.3d 1574 (7th Cir. 1994), a case defendant cites in his brief.  In that case, the court found that guards did not act maliciously when they used force to re-shackle an inmate who had escaped his shackles and then forcibly resisted the guard's efforts to re-shackle him.  Id. at 1583.  Contrary to defendant's suggestion, the court did not authorize prison guards to use any means necessary to regain, "hands-on, physical control" of an inmate, particularly one who is not actively resisting.  In fact, the Seventh Circuit has observed that not every instance of inmate resistance justifies the use of force.  Lewis v. Downey, 581 F.3d 467, 477 (7th Cir. 2009) (citing Treats v. Morgan, 308 F.3d 868, 873 (8th Cir. 2002)).  Rather, each case must be judged on its unique facts, taking into account the relevant Whitley factors, as set out above.

Here, when viewed in the light most favorable to plaintiff, the facts are sufficient to raise a genuine issue of material fact regarding defendant's state of mind when he grabbed plaintiff with both hands and forcibly yanked him towards the wall.  I note that in addition

to the video, plaintiff has sworn under penalty of perjury that defendant deliberately bent plaintiff's wrists or arms to cause the handcuffs to dig into his wrists during the escort. (Although defendant argues that the surveillance video refutes plaintiff's allegations about the handcuffs, the video does not capture the entirety of the escort.) Crediting plaintiff's testimony on this point would lend further support to his theory that defendant threw him against the wall to hurt him and not for any valid security reason.  Because plaintiff has "presented enough  . . . that if the jury accepted his story, it could find in his favor," summary judgment is inappropriate.  Lewis, 581 F.3d 467, 478 (7th Cir. 2009).

### B. Qualified Immunity

In the alternative, defendant argues that he is entitled to qualified immunity.  That doctrine shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Mullenix v. Luna, 577 U.S. 7, 11 (2015).  However, "[t]he notion that unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment is not a new or unusual constitutional principle." Hill v. Shelander, 992 F.2d 714, 718 (7th Cir. 1993) (internal quotations and citations omitted).  "[I]f the finder of fact were to decide that [defendant] acted with malicious intent, there could be no question that a reasonable prison sergeant should reasonably have known that the conduct described by [plaintiff] violated the eighth amendment."  Id.  As explained above, in this case, a reasonable jury could conclude from the facts provided by the parties  that defendant

13

forcibly yanked plaintiff and swung his body towards the wall without having a legitimate security-based reason for doing so. Accordingly, I conclude that defendant is not entitled to summary judgment based on qualified immunity grounds.

ORDER

IT IS ORDERED that the motion for summary judgment of defendants Adam Mattson and Dane County, dkt. #16, is DENIED.

Entered this 8th day of April, 2022.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge